**AFFIRMED and Opinion Filed August 26, 2022**



**In the**

**Court of Appeals**

**Fifth District of Texas at Dallas**

**No. 05-21-00729-CV**

**POSITIVE TRANSPORTATION LLC, THOMAS WHALEY AND THOMAS HATTON, JR., Appellants**

**V.**

**TTS, LLC, Appellee**

**On Appeal from the 44th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-21-09409**

## MEMORANDUM OPINION

Before Justices Carlyle, Smith, and Garcia
Opinion by Justice Carlyle

Positive Transportation LLC, Thomas Whaley, and Thomas Hatton, Jr.

(collectively, the Positive Parties) appeal from the trial court's second amended order

granting a temporary injunction in favor of TTS, LLC.[1] We affirm in this

memorandum opinion. *See* TEX. R. APP. P. 47.4.[2]

---

[1] After the parties signed the agreements at issue, TTS, LLC merged with Sunteck Transport Group to form Suntecktts. Mode Transportation, which later acquired Suntecktts, now owns TTS, LLC's contractual rights. We use "TTS" to refer collectively to Mode, Suntecktts, and TTS, LLC.

[2] To protect confidential information, the parties filed both their briefs and the record under seal. We make every effort in this opinion to preserve the confidentiality of that information, while being mindful of our obligation to provide a public opinion explaining the basis of our decision. *See MasterGuard L.P. v. Eco Techs. Int'l, LLC*, 441 S.W.3d 367, 371 (Tex. App.—Dallas 2013, no pet.).

TTS is a nationwide third-party logistics company that utilizes a network of carriers to ship goods for businesses. Positive, co-owned by appellants Whaley and Hatton, began serving as one of TTS's sales agents in March 2006. Under the terms of the Sales Agent Agreement governing their relationship, Positive agreed to sell TTS's services and provide customer support in exchange for a percentage sales commission.

Attached as Exhibit A to the Sales Agent Agreement, and central to this dispute, is an Agreement Regarding Confidentiality, Non-Solicitation, Non-Competition, Non-Recruitment, and Inventions (the Confidentiality Agreement). In that agreement, TTS agreed to provide "new Confidential Information," which it defined as including TTS's "business, proprietary, and technical information not known to others that could have economic value to others if improperly disclosed." Also included was "any information [TTS] discloses to [Positive] . . . including without limitation . . . the identity of any and all customers, consultants, and suppliers."

Positive agreed that the "Confidential Information" was valuable, and it promised not to use or disclose that information for any purpose other than furthering TTS's business. Ancillary to that promise, Positive agreed that, for a period of one year following the Sales Agent Agreement's termination, it would not directly or indirectly "solicit business, or attempt to solicit business, in products or services

–2–

competitive with products or services sold by [TTS], from (a) any customer or client of [TTS], or (b) any prospective customer or client with whom [Positive] dealt or solicited." Positive also promised that, for the same one-year period, it would not "within any of the markets in which [TTS]" sold or planned to sell products or services, "engage in or contribute . . . knowledge to any employment, work, business, or endeavor which is competitive with any business of [TTS]."

On June 25, 2021, Positive provided TTS notice that it was terminating the Sales Agent Agreement. Before the agreement ended, however, Positive negotiated a deal to become a sales agent for EmergeTech, LLC (Emerge)—TTS's direct competitor. In fact, on June 3, 2021, Positive entered into an agreement with Emerge (the Emerge Agreement) that called for Positive "to identify and solicit customers and obtain shipments of goods for transport via the Emerge platform."

Before terminating the Sales Agent Agreement, Positive engaged in discussions with at least three customers about switching their accounts over to Emerge. Positive also emailed all or substantially all customers it serviced for TTS informing them that it would be working with Emerge as of July 26, 2021 and inviting them to "direct any inquiries about termination of [Positive's] relationship with [TTS] to" Mr. Hatton.

The record also shows that Positive disclosed information to Emerge about TTS's business. That information, to which Emerge otherwise lacked access,

included a list of all customers Positive serviced as TTS's agent, the balance each customer owed TTS, and each customer's TTS credit limit.

Positive and Emerge anticipated their actions might result in litigation. In fact, in an addendum to the Emerge Agreement, they agreed it would be "necessary to hire an attorney" before terminating the contract with TTS, "that it may be necessary to defend against a law suit by [TTS]," and "that there may be a period wherein [Positive] and its officers may be limited for a certain period of time, either by a court order or subsequent settlement agreement." Emerge agreed to pay Positive's legal fees related to terminating the agreement with TTS, as well as any damages award or settlement stemming from a lawsuit. In addition, Emerge agreed to continue paying Positive, at a rate higher than what Positive was earning with TTS, "[i]n the event of a court order or settlement with [TTS] which required Positive Transportation or its officers to refrain from any activity that would diminish its ability to fully perform" the Emerge Agreement.

As anticipated, TTS sued the Positive Parties for damages and injunctive relief, alleging it would suffer irreparable harm if Positive were allowed to continue both disclosing confidential information and soliciting customers on behalf of a direct competitor. After a full evidentiary hearing, the trial court granted TTS a temporary injunction concluding, among other things, that Positive violated the Confidentiality Agreement: (1) by entering into the Emerge Agreement and

–4–

attempting to transition TTS's customers to Emerge while the Sales Agent Agreement was still in effect; and (2) by misappropriating "TTS's Confidential and Proprietary Information," which included its database, "pricing terms, carrier and customer lists,[3] load data, lane information, customer payment terms and outstanding balances, credit limits, customer purchasing history, shipper contracts, carrier payment history, and carrier load history."

The Positive Parties filed this interlocutory appeal, challenging the trial court's order enjoining them from, among other things:

1. Engaging in or contributing their knowledge to any employment, work, business, or endeavor with any company providing third party logistics business that provides and manages motor carrier brokerage services, intermodal marketing services, international air and ocean services, freight forwarding services, supply chain management services, and allocation and interchange of intermodal equipment (the "Business") in competition to TTS—including without limitation, Emerge—in the contiguous United States . . .

3. Using, disclosing, selling, leasing, or otherwise transferring TTS's Confidential and Proprietary Information for Defendants' own benefit, for the benefit of a TTS competitor—including, without limitation, Emerge—or in any other way that diminishes the value of TTS's Confidential and Proprietary Information; and

4. Directly or indirectly soliciting business, or attempting to solicit business, in products or services competitive with products or services sold by TTS in the "Business," from (1) any customer or client of TTS which Defendants did business with on TTS's behalf in the final 12 months of the Agreement or (2) from any prospective customer or client with whom the Defendants dealt with or solicited

---

[3] In subsequent amendments, the trial court separated "carrier and customer lists" as "carrier identities" and "customer lists." This change does not affect our analysis of the issues on appeal.

during the 12-month period immediately preceding the termination of the Agreement.

The Positive Parties argue the injunction order is invalid because: (1) they did not disclose confidential information; (2) they did not violate the non-solicitation covenant; (3) the injunction imposed an impermissible industry-wide ban on their services; (4) neither Positive's agreement with Emerge nor its efforts to explore moving customers over to Emerge violated enforceable covenants; and (5) the trial court inadequately balanced the relevant interests.

While the case was pending on our docket, however, the one-year period in which Positive agreed to refrain from competing against TTS or soliciting its customers expired. Thus, over TTS's objection, the trial court amended its injunction order to remove the restrictions on competition and customer solicitation. Because that amended injunction order supersedes all prior injunction orders in the case, the Positive Parties' challenges to the competition and solicitation restrictions in those orders are now moot. *See* TEX. R. APP. P. 27.3; *Compass Bank NA v. SanJeck LLP*, No. 05-11-00913-CV, 2012 WL 601191, at *2 (Tex. App.—Dallas Feb. 23, 2012, no pet.) (mem. op.). Accordingly, we review only the Positive Parties' challenges to the surviving confidentiality restrictions.

"A temporary injunction's purpose is to preserve the status quo of the subject matter of a suit pending a trial on the merits." *31 Holdings I, LLC v. Argonaut Ins. Co.*, 640 S.W.3d 915, 922 (Tex. App.—Dallas 2022, no pet.). The decision to grant

–6–

a temporary injunction is within the trial court's sound discretion, and we will not reverse unless the trial court abused that discretion. *Id.* A trial court abuses its discretion by granting a temporary injunction "if it misapplies the law to established facts or if the evidence does not reasonably support the trial court's determination that the applicant satisfied the required elements." *Id.* In reviewing an order granting a temporary injunction, we "'view the evidence in the light most favorable to the trial court's order, indulging every reasonable inference in its favor,' and defer to the trial court's resolution of conflicting evidence." *Id.* (quoting *Amend v. Watson*, 333 S.W.3d 625, 627 (Tex. App.—Dallas 2009, no pet.)). When, as here, the trial court does not issue separate findings of fact or conclusions of law, we will uphold the order if the record supports any valid legal theory. *Id.*

A temporary injunction requires proof of three elements: (1) a cause of action; (2) a probable right to the relief sought; and (3) probable, imminent, and irreparable injury in the interim. *Id.* at 923. The probable-right-to-relief element does not require a showing that the applicant will prevail at trial; rather, it requires only enough evidence to raise a bona fide issue as to the applicant's ultimate right to relief. *Jowell v. BioTE Med., LLC*, No. 05-21-00166-CV, 2021 WL 4810361, at *7 (Tex. App.—Dallas Oct. 15, 2021, no pet.) (mem. op.). This means there must be some evidence supporting every element of at least one valid legal theory. *31 Holdings*, 640 S.W.3d at 928. With respect to the third element, injury is irreparable if damages cannot

provide adequate compensation to the injured party or if the injured party cannot measure damages by a certain pecuniary standard. *Id.*

The Positive Parties first attack the trial court's conclusion that it misappropriated TTS's confidential information. According to Positive, "misappropriation" cannot provide a basis for the injunction because the trial court entered its order before the Sales Agent Agreement expired. Thus, according to Positive, the injunction issued before Positive had a duty to return any confidential information in its possession. But this argument lacks merit because the term "misappropriation" in this context is not limited to the act of improperly acquiring or retaining confidential information. Rather, "misappropriation" also occurs if a party discloses information it obtained under circumstances giving rise to a duty to maintain confidentiality. *See* TEX. CIV. PRAC. & REM. CODE §§ 134A.002(3)(B)(ii)(b), *Greenville Automatic Gas Co. v. Automatic Propane Gas & Supply, LLC*, 465 S.W.3d 778, 787 (Tex. App.—Dallas 2015, no pet.).

We also reject the Positive Parties' assertion that the information disclosed to Emerge did not qualify as "Confidential Information" because Positive itself generated that information and entered it into TTS's database. To the extent Positive contributed information to TTS's database, TTS presented sufficient evidence that

Positive did so as its agent, while servicing customers on its behalf.[4] Any information Positive acquired and entered into TTS's system in that capacity belonged to TTS, and Positive was not free to disclose it or use it for competitive purposes.

We likewise reject the Positive Parties' assertion that the relevant data was "known to others" for purposes of excluding it from the definition of "Confidential Information." Their interpretation of that phrase—asserting that customer data is not confidential because it is "known to" customers, carrier data is not confidential because it is "known to" carriers, etc.—is not plausible. Indeed, the agreement specifies that "the identity of any and all customers, consultants, and suppliers" disclosed by TTS would be "Confidential Information." If Positive's interpretation were correct, those identities could not be considered confidential because customers would know they are customers, consultants would know they are consultants, and suppliers would know they are suppliers. Understood in its proper context, the phrase "information not known to others" means information not known to the general public or third parties who might use it to compete against TTS.

---

[4] The Sales Agent Agreement states that a general agency relationship would not exist between the parties, and it provides that "except as expressly set forth in this Agreement, [TTS] shall not have control, and [Positive] shall have exclusive control, over when, where, and how [Positive] sells, markets, or provides the Services or performs its other obligations under this Agreement." Nevertheless, the agreement also expressly states that, although Positive would "not be considered an agent" for other purposes, it would be considered TTS's agent "for the solicitation of orders and the provision of customer support in accordance with the" agreement's terms. Moreover, TTS required Positive to "obtain or license, at [TTS's] expense, all software, including data processing, management information, and operating systems required by [TTS]." And it further required Positive to comply with any policies and procedures TTS established for customer service, marketing, selling, and providing services. Thus, at a minimum, TTS presented sufficient evidence to raise a bona fide issue as to whether Positive acted as its agent for purposes of soliciting customers and providing customer support.

And even if certain portions of TTS's data were "known to" the individual customers or carriers to which that data pertained, that would not mean compilations of data involving multiple customers or carriers would not qualify as "Confidential Information." Indeed, TTS's competitors could not recreate the compiled customer list Positive provided to Emerge, which included TTS account balances and credit limits, without both knowing the identity of each customer and having access to each customer's account information. The compiled list was thus neither "known to others" nor readily ascertainable, and Positive was not free to disclose it. *See* TEX. CIV. PRAC. & REM. CODE § 134A.002(6); *see also Baxter & Assocs., L.L.C. v. D&D Elevators, Inc.*, No. 05-16-00330-CV, 2017 WL 604043, at *8 (Tex. App.—Dallas Feb. 15, 2017, no pet.) (mem. op.) (compiled customer list may qualify as a trade secret if not readily ascertainable by proper means).

We also reject the Positive Parties' contention that "Confidential Information" includes only the "new" information TTS disclosed to Positive after executing the Confidentiality Agreement. The statement that TTS agreed to provide "new Confidential Information" refers to the agreement's consideration; it does not limit the scope of any "Confidential Information" subject to non-disclosure. The agreement's section outlining Positive's non-disclosure obligations makes this clear: "In exchange for [TTS's] promises to provide [Positive] with new Confidential Information, [Positive] hereby agrees that neither it nor any of its employees or

–10–

representatives shall . . . disclose to anyone . . . any Confidential Information." The word "any" thus distinguishes the "Confidential Information" Positive agreed not to disclose from the "new Confidential Information" TTS promised to provide.

As for whether information qualifies as confidential only to the extent TTS disclosed it to Positive, the agreement defines "Confidential Information" to include TTS's "business, proprietary, and technical information not known to others that could have economic value to others if improperly disclosed." That definition imposes no disclosure requirement. The agreement does, however, add that "Confidential Information also means any information [TTS] discloses to [Positive], either directly or indirectly," including among other things "the identity of any and all customers, consultants, and suppliers." But the use of the word "also" in this context suggests an additional category of qualifying confidential information, rather than a necessary condition for confidentiality.

But even if we were to assume "Confidential Information" includes only that "new" information TTS disclosed to Positive after the agreement's execution, there would still be a bona fide issue as to whether Positive violated the non-disclosure provisions. At a minimum, the trial court was free to credit testimony that TTS provided the credit limits and account balances Positive eventually passed on to Emerge. And we reject Positive's assertion that those customer credit limits, without more, had no economic value to TTS's competitors. As TTS's representative

testified, obtaining a competitors' credit limits would be useful for evaluating whether a company could obtain more business by offering customers better credit terms.

The Positive Parties argue for the first time in reply that information cannot be confidential unless "developed by" TTS. This argument is unpersuasive and, in any event, we do not consider arguments raised for the first time in a reply brief. *See 31 Holdings*, 640 S.W.3d at 924 n.5. Likewise, we reject the Positive Parties' assertion, also raised for the first time in reply, that the injunction is invalid because it prohibits Positive from using or disclosing information it obtained before entering into the Sales Agent Agreement. Regardless, we do not interpret the injunction as covering customer information Positive possessed before entering into the Sales Agent Agreement.

Finally, we reject the Positive Parties' assertion that TTS provided no probative evidence of irreparable harm. Indeed, "the use of confidential information in cases such as this has been described as 'the epitome of irreparable injury.'" *Retail Serv's WIS Corp. v. Crossmark, Inc.*, No. 05-20-00937-CV, 2021 WL 1747033, at *10 (Tex. App.—Dallas May 4, 2021, pet. denied) (mem. op.) (quoting *Hernandez v. Combined Ins. Co. of Am.*, No. 02-20-00225-CV, 2021 WL 520456, at *21 (Tex. App.—Fort Worth Feb. 11, 2021, no pet.) (mem. op.)). Moreover, Positive expressly acknowledged in the Confidentiality Agreement that the "unauthorized use or

disclosure" of TTS's confidential information "would cause irreparable harm." Although that admission is not dispositive, the trial court was free to consider it as some evidence supporting a finding of irreparable harm. *See Wright v. Sport Supply Grp., Inc.*, 137 S.W.3d 289, 293–94 (Tex. App.—Beaumont 2004, no pet.). The trial court was well within its discretion to determine that Positive's continued use and disclosure of TTS's confidential information, in an effort to steer customers to a competitor, would result in imminent injury that cannot be measured by any certain proper pecuniary standard. *See id.* And the trial court did not abuse its discretion by weighing the evidence and determining that the equities favored protecting TTS's confidential information. *See In re Gamble*, 71 S.W.3d 313, 317 (Tex. 2002) (orig. proceeding).

We affirm the second amended injunction order.

/Cory L. Carlyle/

210729f.p05  CORY L. CARLYLE
JUSTICE

–13–



# Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

POSITIVE TRANSPORTATION
LLC, THOMAS WHALEY AND
THOMAS HATTON, JR.,
Appellants

No. 05-21-00729-CV        V.

TTS, LLC, Appellee

On Appeal from the 44th Judicial
District Court, Dallas County, Texas
Trial Court Cause No. DC-21-09409.
Opinion delivered by Justice Carlyle.
Justices Smith and Garcia
participating.

In accordance with this Court's opinion of this date, the order of the trial court is **AFFIRMED**.

It is **ORDERED** that appellee TTS, LLC recover its costs of this appeal from appellants POSITIVE TRANSPORTATION LLC, THOMAS WHALEY AND THOMAS HATTON, JR.

Judgment entered this 26th day of August, 2022.